# M'Call *against* Coover.

The titles to donation land which had been located by mistake within the triangle, and allotted to soldiers of the revolution, prior to its acquisition by the State of Pennsylvania, were confirmed by the subsequent purchase; and those lands were, therefore, not subject to appropriation by warrant and survey; but they were subject to assessment as unseated, and to be sold for the payment of taxes, and such sale confers a good title upon the purchaser.

The Statute of Limitation protects the title of the claimant not only to the land enclosed and cultivated, but also to the woodland embraced within his designated boundaries.

ERROR to the District Court of *Erie* county.

Sarah M'Call and others against John Coover, Samuel Myers, and others. This was an action of ejectment for 403 acres of land in Beaver Dam township.

The plaintiffs, who claimed under the Population Company, exhibited in evidence the following title, viz. A patent from the Commonwealth for the land in controversy, (and which is known on the population draft as No. 201), to John Field, William Crammond, and James Gibson, trustees of the Population Company, dated 8th May 1806, containing 403 acres 80 perches of land, surveyed pursuant to a warrant dated 13th April 1792, in the name of Robert Bass. A certified copy of the survey as returned into the land-office, surveyed 14th June 1794. A receipt for arrearage of purchase money, dated 29th April 1806, viz. "Robert Bass per John Fields, William Crammond, and James Gibson," being $250. The chain of title was then regularly deduced from the Commonwealth to the plaintiffs for the tract of land known on the population draft as No. 201, warranted in the name of Robert Bass.

The defence set up was not to the regularity of the chain of title exhibited by the plaintiffs, but rested on other grounds. The first evidence given by the defendants was a draft of the 10th Donation District, as returned into the surveyor-general's office the 12th February 1786. By this draft, and the testimony of the surveyors examined on the trial, it appeared that the population warrant, as located, included nearly the whole of donation tract No. 209, and about the half of donation No. 208. The defendants set up

title to donation No. 209, by virtue of a sale for taxes to John Coover. They showed an assessment of Beaver Dam township for 1831 of donation No. 209, valuation $688, county tax $2.37. The unseated land book in which the land appeared as unseated, with the tax of $2.37 carried out, and unpaid, for the year 1831. The sale list of 1832, showing a sale of the land and a bond for the surplus. Deed from the treasurer for No. 209, to John Coover, dated 5th July 1832, and acknowledged 11th August 1832.

As to the part of donation No. 208, included in the plaintiff's survey, and covered by their warrant, the defendants claimed to hold by virtue of the Statute of Limitations. The defendants proved, by Amos Walker, that he commenced clearing on said tract in the fall of 1816, and erected a cabin and moved his family on it in March 1817. He settled on the south part of the tract, and south of the old State line; this part of it was not in controversy. That he paid the taxes on it for the whole tract for several years, when finding a part of the land was in Beaver Dam township, and that he was not taxed for the whole in Waterford township, he requested the assessors and supervisors to assess the land to him in Beaver Dam township, which was not done for several years. That he continued to reside on it, clear, cultivate, and improve it, and pay the taxes on it with the exception of the part for the time adverted to, up to the fall of the year 1828, when he sold all north of the old State line to Samuel Myers, one of the defendants, who immediately took possession of it, built a barn and moved on to it, paid taxes for his part, and cleared and cultivated extensively up to the present time.

In 1836, the Commonwealth granted a patent to Amos Walker for this tract, from which he made a conveyance to Myers, for the part sold to him and lying north of the old State line, on the 5th June 1837. The plaintiffs also proved the payment of taxes from 1813 to 1828, both inclusive, on population No. 201, and gave in evidence an assessment of that number, for many years afterwards. The defendants gave evidence to show that the agent of the Population Company applied to the commissioners of the county and procured an exoneration of the company from the payment of the taxes on No. 201, for the years 1834-5-6-7-8-9, alleging that the land was assessed to others by the donation Nos. embraced and included within the survey.

By an Act passed the 12th of March 1783, the legislature designated the general boundaries within which should be located the lands promised to the soldiers of the revolution by the Act of 1780. This territory is bounded and described as beginning " at the mouth of Mogulbughtiton creek, thence up the Allegheny river to the mouth of Cagnawaga (now Conewango) creek, thence due north to the northern boundary of this State, thence west by the said boundary to the northwest corner of this State," and thence by courses then mentioned to the place of beginning. By the Act

[M'Call v. Coover.]

of the 24th of March 1785, the surveyor-general was authorized and directed to appoint such a sufficient number of deputies as to have the whole tract of country surveyed and returned to him on or before the 1st of February 1786. The surveys thus authorized to be made, were to be in tracts of such a size as the officers or soldiers might respectively be entitled to. To effect this, the general tract of country designated by the Act of 1783 was divided into districts, which were numbered. The land in controversy was supposed to be within the 10th donation district, the surveys of which were made by David Watts, Esq., of Carlisle, during the summer of 1785, and returned into the surveyor-general's office on the 12th of February 1786.

In 1787, the boundary line between New York and Pennsylvania was run and completed by the authority of the respective States, and on the 29th of September 1789 it was confirmed by an Act of Assembly of this State. This line excluded all that tract of country called the Triangle, and in which the land in controversy lay. The deputy-surveyor of the 10th donation district had in 1785 surveyed from 140 to 160 donation tracts, north and partly north of where this State line was afterwards run. The whole of tract No. 209, and about half of 208, is north of this line. The lottery for the distribution of donation lands commenced on the 1st of October 1786, and a draft of these donation Nos. shows that William Gray, Sergeant, drew No. 208, and Robert Pendegrass drew No. 209.

The Indian title to the Triangle, called "Presque Isle lands," was extinguished in 1789. New York and Massachusetts both having surrendered their claims to it, the United States extinguished the Indian title, and by a resolution of Congress of the same year made provisional arrangements for ceding it to Pennsylvania. By the Act of the 13th of April 1791, the governor of Pennsylvania was authorized to complete the purchase from the United States; which he accordingly did in March 1792, for the consideration of $151,640.25, and which was paid in continental certificates. The deed of confirmation from the United States to the State of Pennsylvania, was dated the 3d of March 1792. By the Act of the 3d of April 1792, all lands belonging to the commonwealth "lying north and West of the rivers Ohio and Allegheny and Conewango creek, excepting such parts thereof as *heretofore have been or hereinafter shall be appropriated to any public or charitable use,*" were offered for sale on the conditions prescribed in said Act. This Act placed in the market the lands acquired from the United States by deed of the 3d of March 1792, as well as the other lands not appropriated to public or charitable uses, within the limits mentioned in the Act of 1792. The legislature, on discovering that a large number of the donation surveys returned by David Watts "*fell*" into the State of New York, 140 entire tracts and 23 parts of tracts, by an Act passed the 30th of

IV.—20

September 1791, reciting that a number of surveys had *fallen* into the State of New York, the governor was directed to ascertain the names of persons who had obtained their patents for tracts that had fallen in the State of New York—to publish a list of the same, giving notice to all such persons to apply before the 1st of December next; on which day the surveyor-general should proceed to ascertain by lot the priority such applicants *should have in choosing other lands of like quantity for those that had fallen into the State of New York from the other donation districts;* when such claim should be made, patents to issue without any new fees; but no patents to issue, only the old patents delivered up by the holders. This Act gives to the soldiers who drew land in the Triangle, and north of the State line, as run in 1786–'87, other lands in lieu thereof, lying in the other donation districts, ascertained and known to be within the State of Pennsylvania. It was proved by the plaintiffs by extracts from the books in the surveyor-general's office, that "Isaac Ferree, attorney of Philip Kepler, assignee of William Gray, Sergeant, made choice of No. 51 in the 3d donation district, on the 8th of December 1794, and patented same day." That Robert Pendegrass drew and made choice of No. 15 in the 1st donation district. The certificate goes no further as to whether the land was patented to him or not. The Act of 1791 was continued by several supplements.

The court below instructed the jury as to that part of the land in dispute designated as donation tract No. 209; that the assessment and sale of it conferred no title upon the purchaser. It had no existence in the character in which it had been sold, and was not the subject of taxation as such. And that it did not convey the title of the Population Company, which only embraced a part of the tract; and that the plaintiffs were entitled to recover this part of the land. As to that part of the land which had been in the actual adverse possession of the defendant Myers, and those under whom he claimed for twenty-one years, the court instructed the jury that the plaintiffs were not entitled to recover, and that the defendant was protected in his possession, not only to that part of the land which was included within his enclosure, but also to that woodland embraced within his designated and known boundaries. Verdict and judgment accordingly. Both parties excepted to the charge of the court; and each sued out a writ of error.

*Babbit* and *Walker*, for plaintiffs in error and defendants below.
*Riddle* and *Sill*, for defendants in error and plaintiffs below.

The opinion of the Court was delivered by

Huston, J.—The Act of the 12th of March 1783, after designating a tract for depreciation lands, and reciting a resolution of the General Assembly promising to the officers and soldiers of

[M'Call v. Coover.]

this State who served in the continental army certain donations or quantities of lands as set forth in said resolution, proceeds, in section 5, " That there be, and it is hereby declared to be, located and laid off a certain tract of country beginning at the mouth of Mogulbughtiton creek, thence up the Allegheny river to the mouth of Cagnawaga creek, thence due north to the northern boundary of this State, thence west by the said boundary to the northwest corner of the State, thence south by the western boundary of the State to the northwest corner of land appropriated by this Act for discharging the certificates herein mentioned (the depreciation land), and thence by the same lands east to the place of beginning, which said tract of country shall be reserved and set apart for the only and sole use of fulfilling and carrying into execution the said resolve."

The 6th section enacted, " That no improvement, location, warrant, grant, right, title or claim whatsoever, made or procured by, from or under any Indian nation or nations of Indians, the late proprietaries, or any other person or persons whatsoever, for or upon the lands contained within the limits of the two above described tracts of country, or any part thereof, shall be valid or of any effect in law or equity, but the same shall be null and void to all intents and purposes whatsoever."

The two next sections were altered before the lands were drawn. Next, the Act of the 24th of March 1785, was passed, directing the appointment of surveyors and their duty minutely— making drafts of the 10 donation districts, numbering the tracts, drawing for the right to a particular tract, with the number in each tract to serve to all intents and purposes in lieu of recording patents. The 14th section gives the form of the patent. The 16th section extends the time within which those entitled may apply, and I may here say this time was extended by several laws until 1813. I shall cite the 17th section, however, which provided that the lots undrawn within two years (which I have said was repeatedly extended) should " be laid off, advertised and sold within a reasonable time, under the direction of the supreme executive council for the benefit of the State." This may show that at that time it was not intended that this tract of country should be open to be taken up on warrants and surveys from the land-office in the usual way. The two next sections state that the northern and western lines of the State had not been run, but measures had been taken to have this done; and direct that lands remote from these lines be first surveyed. On the 31st of March 1785, the legislature appointed a commissioner to join with New York in designating the line between these two States. It was completed by the commissioners of the two States and return made the 14th of December 1786, and ratified and confirmed by Act of the 29th of September 1789. (2 *Smith's Laws* 510).

I will here notice the acquisition by this State of a tract of

land on the shores of Lake Erie, designated as the Triangle. In vol. 1 of *Carey & Duane's Acts of Congress*, 467, 468, 469, we find recited certain proceedings of the legislature of New York on the 17th of February 1780, authorizing the delegates of that State in Congress to limit and restrict its boundary on the west, both as to jurisdiction and right of soil. On the 1st of March 1781, page 471, the delegates in Congress of New York limit and restrict the boundaries of said State on the western part thereof, with respect to jurisdiction as well as pre-emption of soil, by a meridian line from the 45th degree of north latitude through the westerly bend or inclination of Lake Ontario; with a provision that it shall be 20 miles west of the river Niagara. 13th of November 1784—*ibid*, page 482, we find recited an Act of the legislature of Massachusetts, authorizing her delegates in Congress to release to the United States such tract of country as lies between the Hudson and Mississippi rivers. 19th of April 1785, her delegates in Congress do release to the United States all right of jurisdiction and soil to all west of a meridian line described in the same words as in the cession by New York. In same book, 575, on the 29th of August 1788, we find a report recites that the board of treasury on the 6th of June 1788 had made a contract with Pennsylvania for the tract bounded east by New York, south by Pennsylvania, and north and west by Lake Erie. And on the 4th of September 1788, it was resolved, " that the United States do relinquish and transfer to Pennsylvania all their right, title and claim to the government and jurisdiction of said land for ever : and it is declared and made known that the laws and public Acts of Pennsylvania shall extend over every part of said tract, as if the said tract had been originally within the charter bounds of said State."

By an Act of 2d October 1788, the sum of £1200 was appropriated to purchase the Indian title to the tract on Lake Erie, contracted to be sold to Pennsylvania by the United States. By an Act of 13th April 1791, the governor was authorized to complete the contract with the United States, which was done on the 3d March 1792, and the consideration, $151,540, paid. Before this could be completed, the meridian line designating the western limit of New York had been run, and the monument stone at Lake Erie set up on 23d August 1790. 4 *Bioren & Carey* 102 is a supplement to the laws relating to donation lands, dated 30th September 1791. The preamble recited that since the line between New York and Pennsylvania had been run, some of the donation lands had fallen within the State of New York, whereby the intentions of the legislature had been frustrated and some of the objects of its bounty disappointed. It provided " that the surveyor-general is authorized to ascertain and report to the governor as soon as may be what number of patents have been granted by this Commonwealth for lands of the description aforesaid which have fallen in the State of New York, together with the number of acres

[M'Call v. Coover.]

contained in each patent, and the names of the persons who obtained the same; on which report being made, the governor was required to cause the report to be printed in at least three newspapers in the city of Philadelphia, giving notice to all persons to apply before the 1st day of December next, on which day the surveyor-general is empowered and enjoined to ascertain by lot in such manner as shall be prescribed by the governor the order of priority according to which the persons who shall have then applied shall proceed to choose other lands instead of those which they have thus lost."

" Sect. 2. The several persons who have thus applied shall, according to the priority fixed by virtue of the preceding section, choose a lot or lots containing the like quantity of acres with the lot or lots they have lost, out of any of the tracts already surveyed, and not otherwise disposed of, within that part of the State appropriated as a donation to certain officers and soldiers by an Act, &c.," (referring to the Act first cited).

" Sect. 3. When the persons aforesaid have made their choice, patents for the same shall be respectively granted to them without any fee, provided that no individual shall be entitled to receive such patent or patents until he has previously returned the patent or patents formerly granted to him for lands that have fallen in the State of New York, that the same may be cancelled, and also given a quit-claim to the Commonwealth for any compensation he may be entitled to for the loss."

In this place I introduce the Act of 3d April 1792, which after a preamble, and after stating the future prices of lands in the purchase of 1768 and 1784, proceeds in the third section—" after the passing of this Act, all other lands belonging to this Commonwealth and within the jurisdiction thereof, and lying north and west of the Ohio, Allegheny, and Conewango Creek, excepting such parts thereof as have heretofore been or shall hereafter be appropriated to any public or charitable use, shall be and are hereby offered for sale," &c.

Seven days after, on 10th April 1792, they passed a law reciting that but few had applied under the Act of 30th September 1791, and directing " another advertisement by the governor in Philadelphia, Lancaster, Chambersburg, York, Harrisburg, Carlisle and Pittsburgh, giving notice to all persons to apply on 1st July next." (3 *Smith* 110), 9th April 1793, officers and soldiers whose lots had fallen within the State of New York who had not drawn and got patents under the previous laws were provided for. The officers of the land-office were to proceed as if the officer or soldier were present, and draw numbers for all whose lots had fallen in New York, and on the application of any one he was to choose out of the lots so drawn in the order in which they should severally apply. (3 *Smith* 233), 17th April 1795, comptroller-general to make a list of all officers and soldiers who have not

IV. — O

heretofore drawn; proceedings directed to draw for all present or absent who have not heretofore drawn; patents to issue, and time of application one year; those out of the State two years; those in the army three years; and after the expiration of the periods aforesaid, so much of the donation lands for which no application shall have been made, *may be disposed of in such manner as the legislature shall in future by law direct.*

It would seem there was no drawing for all who had never applied. (3 *Smith* 383), 11th April 1799, the same proceedings again directed; time for application extended, and then this section—" That on the 1st May 1800 the powers herein granted shall cease; no lots for donation lands shall afterwards be drawn; and the residue of the land heretofore appropriated for satisfying claims to donations shall revert to the Commonwealth, and be disposed of in such manner as shall *be directed by law in relation to other lands the property of the State.*

At that time vacant land could only be obtained by actual settlement. It would seem there had been great negligence in those directed to draw by the Acts recited, for on 23d February 1801, (3 *Smith* 467), another law was enacted making provision for those whose lots had fallen into the State of New York, a list of whom was to be made, and also a list of the number of lots reserved in lieu thereof, to which were to be added eight undrawn lots from any district the applicant might choose, and from these the applicant might choose any lot; also to make a list of those who under former laws had not received patents, and making it the duty of the secretary of the land-office, on application, to make out patents.

On the 2d April 1802, (3 *Smith* 505), we find further legislation in an Act to complete the benevolent intention of the legislature of this Commonwealth, by distributing the donation lands to all who are entitled thereto. It recites that many who are entitled have not applied; that among the lots in the *tenth district,* which the owners have released and drawn other lots in lieu of them, many are still in Pennsylvania, and many lots in other districts have not yet been drawn nor appropriated; and it directs all these numbers to be written on papers of the same size, and put in boxes by the land-officers, and shaken before each drawing; and on the application of any person entitled, he shall draw one or more numbers to complete the quantity to which he shall be entitled; the person first applying to be entitled to the first draft, and a patent or patents to be made to him free of expense—" Provided, that no lot to be drawn or patent to issue in pursuance of this Act shall interfere with or defeat any prior title which may have been acquired under the authority of any former law of the Commonwealth."

Sect. 11. The surveyor-general is directed to have a survey made at the expense of the State in such manner as to ascertain with accuracy all lots within the 10th donation district which

[M'Call v. Coover.]

have been reported as having fallen in the State of New York, and as such returned, and which may still be within the State of Pennsylvania, *or in the Triangle* purchased from Congress, and also to procure returns of all the other lots which are in the general drafts of other donation districts, and which are not otherwise appropriated; and also to divide large into smaller lots, which said released lots or other lots, as soon as the survey of them is made and returned, shall be made use of to supply the boxes mentioned in the foregoing section, with a sufficient number of tickets to carry the design of the Act completely into effect. By the last section, no application for donation land shall be admitted, and no patent for such land already applied for shall be granted, unless such patent is demanded within one year. But the time was extended for one year by the Act of 1st April 1803, and one year more by Act of 29th March 1804. Other Acts continued it till 1st of April 1810.

To understand the next Act, it must be known that in a former law directing the surveys of the donation lands, provision had been made for an agent to explore the donation reservation, and to report whether any, and if any, what parts of it were not susceptible of cultivation, and the lots in such parts were not to be put into the wheel to be drawn. So much of the second district was reported not susceptible of cultivation that it was called the *struck district.* But many who had never been in the army settled on it and made valuable improvements, on what was in fact good land. The lots surveyed there were put in the wheel under the last Act, and drawn, and the soldier would have the expense and delay of a lawsuit to encounter before he got possession. On the 25th of March 1805, (4 *Smith* 223–4), it was enacted that it should be the duty of the land-officers to take out of the wheel all tickets for donation lots in the easternmost part of the second, (commonly called the struck), district, which tickets shall not again be put in the wheel, but said lands shall be reserved for and granted to those who may have settled the same agreeably to Act of 3d April 1792; and all such settlers who shall fully comply with the provisions of said Act, and the subsequent Acts relative to the disposal of vacant lands of this Commonwealth, shall obtain patents for the same in the usual manner; and the officers of the land-office, on the application of any person holding donation lands by patent within the bounds aforesaid, or within the part called the Triangle, and such applicant releasing his or her patent or patents to the Commonwealth, shall have another unappropriated lot or lots of equal quantity, which said lot or lots shall be patented to the person so releasing, in the usual manner, free of expense.

In the Act of 1802, the direction to put in the wheel all undrawn lots, had been understood to require putting into the wheel the lots lying in the parts rejected or struck: much of these tracts of country had been settled, and there conflicting titles would occur.

[M'Call v. Coover.]

The soldier might avoid this by releasing his lot drawn, but he was not bound to release.

The next observation arising on this law is, that the legislature considered the settlement on the lands within the tract of country reserved for officers and soldiers was illegal, and gave no title until this law sanctioned them; which it did, if the soldier or officer released; but it was only actual settlers under the law of 1792 or 1794 to whom they were confirmed.

The last Act of Assembly which seems to require notice, is dated the 26th of March 1813, (6 *Penn. Laws* 64): it enacts, that any person who, previous to the passing of this Act, has made an improvement and actual settlement on a tract of land which shall remain undrawn on the 1st of October next, and any person who after the 1st of October next shall make an improvement and actual settlement on an undrawn tract of donation land, erect a house, reside three years and clear and fence 10 acres, and make proof thereof before a judge or justice of the peace of the county, and produce a certificate of the deputy-surveyor of the number of the tract on which he is settled, shall be entitled to a patent on paying $1.50 per acre, with interest from three years after the date of his settlement. By an Act of the 25th of February 1819, the price to be paid to the State by those who have settled or shall settle on a tract of undrawn donation land, is reduced to fifty cents an acre, bearing interest after three years from the date of the settlement.

By these Acts, we see that the legislature again recognise that the tract of country set apart for donation was not open for those who had taken warrants or made actual settlements under the Act of the 3d of April 1792. The price, instead of $20 per 100 acres, is to be first $1.50 per each acre, and then 50 cents per acre; and this only as to undrawn donation tracts. As to such tracts as had been drawn, they make no provision. They seem to have been uniformly considered as much out of the power of the legislature as any other land for which a patent had been granted. There was at times, and under particular circumstances, an option given to the soldier to release and draw another tract; and if he did so, and gave up his first patent and took another, this to be sure was binding on the State and the soldier; but this was never compulsory on the soldier or obligatory on him until he surrendered his first patent and took a new one. There was a time when the board of property was directed to draw for absent soldiers, and grant patents to any soldier who applied for the tract so drawn for him; but this was abandoned, and by the Act of 1802, all those numbers so drawn and for which patents had not been taken, were put back in the wheel; as this direction is expressly given as to those donation tracts which lay in the Triangle.

On a careful view and review of all the Acts of Assembly relat-

[M'Call v. Coover.]

ing to donation lands, I can find nothing which gives any colour
to the idea that the legislature ever assumed or intended to assume
any power or authority over a tract of land drawn by and patent-
ed to a soldier or officer.   Where the lot of any one fell in New
York on running the State line, they granted another instead of
it.   But it was argued here and seems to have been assumed by
the court below, that the legislature considered the lots which fell
in the Triangle in the same situation as those which fell in New
York.   The language of the laws does not say so.   And as those
lots in New York are mentioned in several laws, and the Triangle
never mentioned expressly before the Act of 1802, and then the
undrawn lots in the Triangle are directed to be put into the wheel
to supply lots for those who had lost lots in New York, or who
had not yet drawn any lot, there is no colour for supposing the
legislature meant anything but what they said.   We must, from
the respect due to the legislature, suppose they did know some
lots had fallen in the Triangle.   In point of fact it is certain they
did know it.   They had ratified and confirmed the line in 1789—
about the same time they had purchased from the Indians.   The
Triangle had been surveyed and then paid for in March 1792, just
one month before the Act of the 3d of April 1792, by which these
lands were reserved for officers and soldiers.   Where a party sells
land to which he has only a defective title, and he afterwards
acquires a valid title, it enures to his vendee.   The legislature
and the courts knew and acted on this.   The western line of
Pennsylvania was to run parallel to the Delaware — where it
would have run will never be known now — but under the appli-
cation of the 3d of April 1769, and under warrant from the land-
office, a large portion of this county and still larger portion of
Washington, had been appropriated as in this State, which never-
theless was clearly in Virginia.   After the treaty with Virginia,
that county became Pennsylvania, and it never was imagined
that all titles acquired from the State previous to that treaty,
were made void by it.   Though these applications and warrants
were laid out of the State, and therefore invalid until that treaty,
instead of being destroyed and made worthless by the treaty, it
made them valid and secure.   This has never been denied.   The
only exception to the law as above stated, arose on Acts of Assem-
bly, which to prevent intrusion on Indian lands, leading to blood-
shed, made all purchases from Indians and surveys on Indian lands
absolutely void — nay, criminal; but those laws only applied to
individuals.   The State could and did purchase from Indians, and
the very tract of country in question was set apart for donation
land in 1783, though it was not purchased from the Indians until
1784 and 1789.

   I do not rely on it, nor is it necessary to the decision of this
cause; but the Population Company knew there were donation
lands within the Triangle, and left a space (larger than the inter-

IV. — 21                    o *

ference which gives rise to this suit) as being covered by donation surveys.   To be sure, when they found it was not donation land, they since appropriated it; but it shows the present claim is an after thought, and by those who had notice.

The claim of the plaintiffs in this suit is founded on a warrant dated the 13th of April 1792, surveyed the 14th of June 1794, and patented to the trustees of the Population Company on the 8th of May 1806, and the title deduced to the present plaintiffs.   The defendants claim a right to two tracts of donation land, viz. 209 drawn by Robert Pendegrass and patented to him, and 208 drawn by and patented to William Gray.   It was shown and admitted that the whole of 209 and part of 208 were north of what was fixed as the State line; in other words, were in the Triangle purchased as above, after the donation tracts had been surveyed, drawn by and patented to the soldiers.   And first as to No. 208 drawn and patented to William Gray.   It is recited in more than one Act of Assembly, that several soldiers had released their tracts under the idea that they had fallen into the State of New York, which were afterwards found not to be in the State of New York. Isaac Ferree, the assignee of William Gray, not only released, but drew another lot in another district, gave up his patent for lot No. 208 in 10th district, and got a patent for the second drawn lot.   Without doubt his patent will give a good title (unless lost in some way) to the second drawn lot; and the lot in question became for aught we see an undrawn donation lot: but there was never any law which authorized it to be appropriated by warrant and survey.   It may be held by improvement and actual settlement continued, and payment of 50 cents an acre to the State. In 1836, Amos Walker, who had settled on it in 1816, and resided on it ever since, and claimed and paid taxes for the whole donation tract 208, got a patent from the commonwealth for it as donation tract 208, undrawn and held by actual settlement and continued residence, and in 1837 he conveyed the northern part (which is the part in dispute) to Myers, one of the defendants.

Before Walker went on to this tract, the Act of 1813 had been passed, allowing any person to take possession of an undrawn donation lot, and giving such person a right to such lot on the terms in the Act as before recited.   Twenty-one years he and those under him have been in continued possession, claiming and paying taxes for the whole lot, although they have not cleared and fenced the whole of it.   The question as to how much an actual settler can hold, has been a subject of discussion, and the decisions were first that he held 400 acres.   *Pederick* v. *Searle*, (5 *Serg. & Rawle* 236); *Overfield* v. *Christie*, (7 *Serg. & Rawle* 172).   Then came *Miller* v. *Shaw*, (*Ibid* 129), and a succession of cases.   In *M'Call* v. *Neely*, (3 *Watts* 69), these decisions were shaken.   In *Altemus* v. *Criswell*, Judge Kennedy announced the deliberate opinion of all the judges, that the statute protected the

[M'Call v. Coover.]

usual quantity of woodland, if designated and publicly known, as much as it protected the house and fields. This is not likely to be changed—for on any other construction, the woodland may be taken on a warrant and survey one hundred years old, though the improvement title has passed through two or three generations and as many sales.

But another objection was made. It was said the old State line passes through this tract, and an improvement could not include lands on both sides of it. This is a mistake of fact. There was no State line then, nor has there been since the Triangle was ceded to Pennsylvania in 1788 and 1792; and this improvement began in 1816, when Lake Erie had at that part been long the northern line of the State. We are familiar with this. A county has known lines; but a new county is erected and the old lines are changed; and after this the old lines have no effect on titles to be acquired, further than they may be of use in designating locality. I have already stated the fact, that if a donation tract fell partly or wholly into the Triangle, it did not destroy the title, unless the soldier released it and gave up his patent for it, and accepted another patent for another tract. As to this tract, the judgment of the court below is affirmed.

Next, as to donation tract No. 209, drawn by Robert Pendegrass. By the general draft of the 10th district, under seal of office, it appears that in the surveyor-general's office this tract has inserted in it, and in 1818 (how long before we do not know, probably from 1786), Stephen Loudon, assignee of Robert Pendegrass. It also appears that on the 8th of December 1794, when the officers of the land-office had met to permit soldiers to draw, and when the assignee of William Gray did release and draw and take a new patent, as before stated, that another tract was drawn in another district for Pendegrass. The land officers at that time drew for absent soldiers—whether Pendegrass was present and drew, or the land officers drew for him, does not appear. There is no mention of his assignee, and no entry that he released, gave up his old patent, and accepted another for the tract then drawn, as there is in the case of Gray; and as it was expressly enjoined on the officers to make an entry of it, if he had released and taken a new patent, we must here take it he never did so. No. 209 is then before us a drawn and patented tract, and aliened to Stephen Loudon; and as such was taxed regularly and sold and a deed to John Coover, as is stated in the paper-book and opinion of the court. There is no objection of any irregularity in the assessment and sale. In this case, Coover purchased at commissioners' sale for taxes in 1832; not exactly proved when he took possession. It is not, however, material. The plaintiffs have no right by their warrants and surveys to any tract drawn by any soldier or officer; and they cannot recover from any one in possession of such tract by transfer from such soldier, whether the transfer is

[M'Call v. Coover.]

by conveyance from him directly, or as in this case, by legal process.

The judgment, according to the finding of the jury and direction of the court, as to lot 209, was for the plaintiff below. This part of the judgment is reversed, and a *venire de novo* awarded.